UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PHILIP A. DENNEY,

                                   NO. CIV.S-06-1711 LKK/GGH

       Plaintiff,

    v.                              O R D E R

DRUG ENFORCEMENT
ADMINISTRATION, et al

       Defendants.

_____/

Plaintiff, a California physician, has brought a First Amendment challenge based upon the alleged undercover investigation of his medical office by defendants.  Plaintiff contends that defendants, who include the DEA and various state and federal officials, conducted a retaliatory investigation in response to his speech concerning medical marijuana, in violation of the injunctive order upheld in Conant v. Walters, 309 F.3d 629 (9th Cir. 2002). Pending before the court is the federal defendants' motion to dismiss and motion for summary judgment, as well as plaintiff's application for a continuance under Rule 56(f) of the Federal Rules

1

1  of Civil Procedure.   For the reasons set forth below, the court

2  denies the motion to dismiss and motion for summary judgment with

3  respect to the First Amendment and equal protection claims, grants

4  the motions with respect to the remaining claims, and grants

5  plaintiff's application for a continuance.

**I. Facts**

7  **A. Plaintiff**

8      Plaintiff Philip Denney is physician who has been licensed

9  to practice medicine in the State of California since 1977.

10  First Am. Compl. ("Compl.") ¶ 5.  Since graduating medical

11  school at the University of Southern California, he has

12  practiced Family, Emergency, and Occupational Medicine.   <u>Id.</u>   He

13  has never been disciplined by the state medical board, nor has

14  he had his hospital privileges revoked, suspended, or

15  restricted.   <u>Id.</u>   In addition to other locations, Dr. Denney has

16  a medical office located in Redding, California, the site of the

17  activities at issue in this case.   <u>Id.</u>

18      Dr. Denney is an outspoken proponent of medical marijuana.

19  He has been qualified to testify as an expert witness regarding

20  the use of cannabis in at least seventeen counties in

21  California, has testified before the California Medical Board

22  regarding medicinal cannabis, and is a founding member of the

23  Society of Cannabis Clinicians.   <u>Id.</u>

24  **B. Undercover Visits to Plaintiff's Office**

25      On two occasions, defendants sent in either a confidential

26  source ("CS") or undercover agent in order to obtain a medical

2

1  marijuana recommendation from Dr. Denney.  The government

2  asserts that the background to both visits was the investigation

3  of the Dixon Herbs marijuana dispensary in Redding.  It claims

4  that as part of this investigation, the Redding Police

5  Department had previously sent confidential informants ("CIs")

6  to attempt to buy marijuana from Dixon Herbs in September 2005.

7  Defs.' Statement of Undisputed Fact ("SUF") ¶¶ 4-5.  One, who

8  had a medical marijuana recommendation, was successful, whereas

9  another, who did not have a recommendation, was not.  Id.

10  On September 20, 2005, a CS for the DEA attempted to buy

11  marijuana from Dixon Herbs without a marijuana recommendation.

12  Compl. ¶ 9.  As with the Redding Police Department CI who did

13  not have a recommendation, the DEA CS was also turned away.  Id.

14  He was, however, allegedly told to ask for someone by the name

15  of "Amber" at Dr. Denney's office, who might be able to

16  facilitate a recommendation.  SUF ¶ 7.

17  **1. September 21, 2005 Visit**

18  The next day, on September 21, 2005, the CS went to Dr.

19  Denney's office and asked if he could see the doctor.  Compl. ¶

20  11.  The receptionist asked for his/her medical records, which

21  the CS reported were unavailable because he/she had recently

22  moved from Mississippi and that the records had been destroyed

23  in Hurricane Katrina.  Id.  The receptionist went out of the

24  office and, it is claimed, looked at the CS' vehicle to confirm

25  that it had Mississippi license plates, which it did.  Id.

26  Thereafter, Dr. Denney examined the CS, whose chief

1    complaint was a pinched sciatic nerve that caused chronic pain.
2    Id.  Dr. Denney asked if he/she attempted other mainstream
3    prescription medications, and was told that he/she did, but that
4    these medications caused stomach problems.   Id.  Plaintiff then
5    indicated that the CS was a candidate for the medical use of
6    marijuana and explained that it was to be used only as
7    recommended, not as a recreational drug.   Id.  He then gave the
8    CS a written recommendation.   Id.

9         While the CS was inside, an investigator surveilled the
10   office from the street.   Ex. G.  Although fitting the CS with a
11   convert transmitter or monitoring device had apparently been
12   considered, the investigators decided against it because the
13   transaction was to take place within a doctor's office.   Id.
14   Before the CS entered the office, the investigators checked him
15   for contraband and money and established a prearranged meeting
16   point where they were to meet after he left plaintiff's office.
17   Id.

18        On September 27, 2005, the CS bought marijuana at Dixon
19   Herbs assertedly using the marijuana recommendation obtained
20   from plaintiff.  SUF ¶ 10.

21        **2. November 9, 2005 Visit**

22        On November 9, 2005, defendants DEA Agent Dennis Hale, ATF
23   Agent Steven Decker, and Redding Police Officers Tracy Miller
24   and Eric Wallace conducted a briefing regarding the procurement
25   of a medical marijuana recommendation from plaintiff.  Compl. ¶
26   12.  Agent Decker was chosen to procure the marijuana

1 recommendation and use it at Dixon Herbs because he was the only

2 conveniently available agent with an appropriate undercover

3 identity.  SUF ¶ 16.  The investigators then approached

4 plaintiff's office and surveilled it while Agent Decker was

5 inside.  SUF ¶ 18.

6     Using a false driver's license, Agent Decker told

7 plaintiff's receptionist that his name was Steven Hoffmaster.

8 Compl. ¶ 18.  When asked for prior medical records, he stated

9 that he had been to a hospital in Santa Clara but could not

10 recall which one.  <u>Id.</u>  The receptionist called several

11 hospitals in Santa Clara, but found no record of a Steven

12 Hoffmaster.  <u>Id.</u>  Agent Decker was told that the examination

13 could proceed while the receptionist tried to locate his prior

14 medical records.  <u>Id.</u>

15     During the examination, Agent Decker told Dr. Denney that

16 he had been in a motorcycle accident, which caused him to have

17 daily pain in his neck.  Compl. ¶ 15.  Agent Decker then showed

18 plaintiff a scar on his neck, the product of the alleged

19 motorcycle accident.  <u>Id.</u>  After the examination, Dr. Denney

20 provided a written recommendation to Agent Decker approving of

21 the use of medical marijuana.  <u>Id.</u>

22     On November 21, 2005, Agent Decker bought marijuana from

23 Dixon Herbs.  SUF ¶ 23.  On December 5, 2005, a state court

24 search warrant was executed at Ron Dixon's residence, resulting

25 in the seizure of marijuana.  SUF ¶ 24.  On the same day, a

26 state court search warrant was executed at Dixon Herbs,

1  resulting in the seizure of marijuana, scales, and three

2  firearms.  SUF ¶ 25.  Dixon and two associates were arrested.

3  Id.  The state court criminal action against Ron Dixon has

4  survived preliminary hearing and is set for trial.  SUF ¶ 27.

5  **C. Procedural History**

6       Although both sides in this case have exchanged mandatory

7  initial disclosures, no discovery has taken place.  On February

8  1, 2007, the federal defendants filed a motion for protective

9  order, staying discovery until resolution of their pending

10 motion to dismiss and motion for summary judgment.  On February

11 13, plaintiff stipulated to the stay in discovery, and the

12 magistrate judge accordingly stayed all discovery until the

13 resolution of defendants' motions.  In addition to its

14 opposition to the motion, plaintiff has filed an application for

15 a continuance under Federal Rule of Civil Procedure 56(f), which

16 provides that "the court may refuse the application for judgment

17 or may order a continuance to permit affidavits to be obtained

18 or depositions to be taken or discovery to be had."

19                          **II. Standard**

20 **A. Motion to Dismiss for Lack of Subject Matter Jurisdiction**

21 **Under Fed. R. Civ. P. 12(b)(1)**

22      It is well established that the party seeking to invoke the

23 jurisdiction of the federal court has the burden of establishing

24 that jurisdiction exists.  <u>KVOS, Inc. v. Associated Press</u>, 299

25 U.S. 269, 278 (1936); <u>Scott v. Breeland</u>, 792 F.2d 925, 927 (9th

26 Cir. 1986).  On a motion to dismiss pursuant to Federal Rule of

1 Civil Procedure 12(b)(1), the standards that must be applied

2 vary according to the nature of the jurisdictional challenge.

3     If the challenge to jurisdiction is a facial attack, i.e.,

4 the defendant contends that the allegations of jurisdiction

5 contained in the complaint are insufficient on their face to

6 demonstrate the existence of jurisdiction, the plaintiff is

7 entitled to safeguards similar to those applicable when a Rule

8 12(b)(6) motion is made.  The factual allegations of the

9 complaint are presumed to be true, and the motion is granted

10 only if the plaintiff fails to allege an element necessary for

11 subject matter jurisdiction.  See 2A J. Moore, J. Lucas & G.

12 Grotheer, Moore's Federal Practice ¶ 12.07 (2d ed. 1987); see

13 also Eaton v. Dorchester Development, Inc., 692 F.2d 727, 731

14 (11th Cir. 1982); Williamson v. Tucker, 645 F.2d 404, 412 (5th

15 Cir. 1981), cert. denied, 454 U.S. 897 (1981); Mortensen v.

16 First Fed. Sav. & Loan Ass'n., 549 F.2d 884, 891 (3d Cir. 1977).

17 A complaint will be dismissed for lack of subject matter

18 jurisdiction (1) if the case does not "arise under" any federal

19 law or the United States Constitution, (2) if there is no case

20 or controversy within the meaning of that constitutional term,

21 or (3) if the cause is not one described by any jurisdictional

22 statute.  Baker v. Carr, 369 U.S. 186, 198 (1962).

23     If the challenge to jurisdiction is made as a "speaking

24 motion" attacking the truth of the jurisdictional facts alleged

25 by the plaintiff, a different set of standards must be applied.

26 Thornhill Pub. Co., Inc. v. General Tel. & Elec. Corp., 594 F.2d

1  730, 733 (9th Cir. 1979).   Where the jurisdictional issue is

2  separable from the merits of the case, the district court is

3  free to hear evidence regarding jurisdiction and to rule on that

4  issue prior to trial, resolving factual disputes where

5  necessary.   Augustine v. United States, 704 F.2d 1074, 1077 (9th

6  Cir. 1983); Thornhill, 594 F.2d at 733.   "In such circumstances

7  '[n]o presumptive truthfulness attaches to plaintiff's

8  allegations, and the existence of disputed material facts will

9  not preclude the trial court from evaluating for itself the

10  merits of jurisdictional claims.'"   Augustine, 704 F.2d at 1077

11  (quoting Thornhill, 594 F.2d at 733).

12     However, where the jurisdictional issue and substantive
   issues are so intertwined that the question of
13     jurisdiction is dependent on the resolution of factual
   issues going to the merits, the jurisdictional
14     determination should await a determination of the
   relevant facts on either a motion going to the merits or
15     at trial.

16  Augustine, 704 F.2d at 1077 (citing Thornhill, 594 F.2d at 733-

17  35; 5 C. Wright & A. Miller, Federal Practice & Procedure

18  § 1350, at 558 (1969 & Supp. 1987)).   On a motion going to the

19  merits, the court must, of course, employ the standard

20  applicable to a motion for summary judgment.   Farr v. United

21  States, 990 F.2d 451, 454 n. 1 (9th Cir. 1993), cert. denied,

22  510 U.S. 1023 (1993).

23  **B. Motion to Dismiss for Failure to State a Claim Under Fed. R.**

24  **Civ. P. 12(b)(6)**

25     On a motion to dismiss, the allegations of the complaint

26  must be accepted as true.   See Cruz v. Beto, 405 U.S. 319, 322

1  (1972).  The court is bound to give the plaintiff the benefit of

2  every reasonable inference to be drawn from the "well-pleaded"

3  allegations of the complaint.  See Retail Clerks Intern. Ass'n,

4  Local 1625, AFL-CIO v. Schermerhorn, 373 U.S. 746, 753 n.6

5  (1963).  Thus, the plaintiff need not necessarily plead a

6  particular fact if that fact is a reasonable inference from

7  facts properly alleged. See id.; see also Wheeldin v. Wheeler,

8  373 U.S. 647, 648 (1963) (inferring fact from allegations of

9  complaint).

10      In general, the complaint is construed favorably to the

11  pleader.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  The

12  court may not dismiss the complaint if there is a reasonably

13  founded hope that the plaintiff may show a set of facts

14  consistent with the allegations.  Bell Atlantic Corp. v.

15  Twombly, 127 U.S. 1955, 1967-69 (2007).  In spite of the

16  deference the court is bound to pay to the plaintiff's

17  allegations, however, it is not proper for the court to assume

18  that "the [plaintiff] can prove facts which [he or she] has not

19  alleged, or that the defendants have violated the . . . laws in

20  ways that have not been alleged." Associated Gen. Contractors

21  of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519,

22  526 (1983).

23  **C. Summary Judgment Under Fed. R. Civ. P. 56**

24      Summary judgment is appropriate when it is demonstrated

25  that there exists no genuine issue as to any material fact, and

26  that the moving party is entitled to judgment as a matter of

1  law.   Fed. R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Adickes v. S.H. Kress &</u>

2  <u>Co.</u>, 398 U.S. 144, 157 (1970); <u>Secor Ltd. v. Cetus Corp.</u>, 51

3  F.3d 848, 853 (9th Cir. 1995).

4       Under summary judgment practice, the moving party

5       always bears the initial responsibility of informing
        the district court of the basis for its motion, and
6       identifying those portions of "the pleadings,
        depositions, answers to interrogatories, and
7       admissions on file, together with the affidavits, if
        any," which it believes demonstrate the absence of a
8       genuine issue of material fact.

9  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).   "[W]here

10 the nonmoving party will bear the burden of proof at trial on a

11 dispositive issue, a summary judgment motion may properly be

12 made in reliance solely on the 'pleadings, depositions, answers

13 to interrogatories, and admissions on file.'"   <u>Id.</u>   Indeed,

14 summary judgment should be entered, after adequate time for

15 discovery and upon motion, against a party who fails to make a

16 showing sufficient to establish the existence of an element

17 essential to that party's case, and on which that party will

18 bear the burden of proof at trial.   <u>See</u> <u>id.</u> at 322.   "[A]

19 complete failure of proof concerning an essential element of the

20 nonmoving party's case necessarily renders all other facts

21 immaterial."   <u>Id.</u>   In such a circumstance, summary judgment

22 should be granted, "so long as whatever is before the district

23 court demonstrates that the standard for entry of summary

24 judgment, as set forth in Rule 56(c), is satisfied."   <u>Id.</u> at

25 323.

26       If the moving party meets its initial responsibility, the

burden then shifts to the opposing party to establish that a
genuine issue as to any material fact actually does exist.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv.
Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

In attempting to establish the existence of this factual
dispute, the opposing party may not rely upon the denials of its
pleadings, but is required to tender evidence of specific facts
in the form of affidavits, and/or admissible discovery material,
in support of its contention that the dispute exists.  Fed. R.
Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First
Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954
(9th Cir. 1998).  The opposing party must demonstrate that the
fact in contention is material, i.e., a fact that might affect
the outcome of the suit under the governing law, Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local
No. 169, Ass'n of Western Pulp and Paper Workers, 971 F.2d 347,
355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific
Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)), and
that the dispute is genuine, i.e., the evidence is such that a
reasonable jury could return a verdict for the nonmoving party,
Anderson, 477 U.S. 248-49; see also Cline v. Indus. Maint. Eng'g
& Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

In the endeavor to establish the existence of a factual
dispute, the opposing party need not establish a material issue
of fact conclusively in its favor.  It is sufficient that "the

11

1  claimed factual dispute be shown to require a jury or judge to

2  resolve the parties' differing versions of the truth at trial."

3  First Nat'l Bank, 391 U.S. at 290; see also T.W. Elec. Serv.,

4  809 F.2d at 631.  Thus, the "purpose of summary judgment is to

5  'pierce the pleadings and to assess the proof in order to see

6  whether there is a genuine need for trial.'"  Matsushita, 475

7  U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's

8  note on 1963 amendments); see also Int'l Union of Bricklayers &

9  Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752

10 F.2d 1401, 1405 (9th Cir. 1985).

11      In resolving the summary judgment motion, the court

12 examines the pleadings, depositions, answers to interrogatories,

13 and admissions on file, together with the affidavits, if any.

14 Rule 56(c); see also In re Citric Acid Litig., 191 F.3d 1090,

15 1093 (9th Cir. 1999).  The evidence of the opposing party is to

16 be believed, see Anderson, 477 U.S. at 255, and all reasonable

17 inferences that may be drawn from the facts placed before the

18 court must be drawn in favor of the opposing party, see

19 Matsushita, 475 U.S. at 587 (citing United States v. Diebold,

20 Inc., 369 U.S. 654, 655 (1962) (per curiam)); see also

21 Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121,

22 1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn

23 out of the air, and it is the opposing party's obligation to

24 produce a factual predicate from which the inference may be

25 drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp.

26 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

1 Cir. 1987).

2     Finally, to demonstrate a genuine issue, the opposing party

3 "must do more than simply show that there is some metaphysical

4 doubt as to the material facts. . . . Where the record taken as

5 a whole could not lead a rational trier of fact to find for the

6 nonmoving party, there is no 'genuine issue for trial.'"

7 <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

8                          **III. Analysis**

9     Plaintiff alleges that the federal defendants (1) violated

10 his First Amendment rights, <u>Bivens v. Six Unknown Fed. Narcotics</u>

11 <u>Agents</u>, 403 U.S. 388 (1971), (2) conspired to interfere with his

12 rights under the due process and equal protection clauses, 42

13 U.S.C. § 1985(3), and (3) failed to prevent the objectives of

14 this alleged conspiracy, 42 U.S.C. § 1986.  He seeks damages as

15 well as injunctive and declaratory relief.

16 **A. First Amendment Claim**

17      **1. <u>Conant v. Walters</u>**

18     The crux of plaintiff's First Amendment claim is that

19 defendants engaged in an investigation of his medical practice

20 as an act of retaliation for his speech concerning medical

21 marijuana.  In <u>Conant</u>, the Ninth Circuit upheld a permanent

22 injunction enjoining the government from revoking a physician's

23 license to prescribe controlled substances based solely on the

24 physician's professional recommendation of the use of medical

25 marijuana, and, as particularly relevant here, from conducting

26 an investigation of a physician based on the same impermissible

1  motive.  309 F.3d at 636.

2      Conant's holding is premised on the notion that a

3  physician's candid discussion of the advantages and

4  disadvantages of medical marijuana with his or her patient is

5  speech protected by the First Amendment.  See Rust v. Sullivan,

6  500 U.S. 173, 200 (1991) (noting that regulations on physician

7  speech may "impinge upon the doctor-patient relationship").

8  Conant held that punishing physicians for recommending medical

9  marijuana to their patients is a form of content discrimination

10  as well as viewpoint discrimination.  Conant, 309 F.3d at 637

11  ("[T]he [government's] policy does not merely prohibit the

12  discussion of marijuana; it condemns expression of a particular

13  viewpoint, i.e., that medical marijuana would likely help a

14  specific patient.").

15      Conant rejected the government's argument that the

16  injunction would protect criminal conduct.  The court held that

17  a doctor's mere anticipation that the patient would use his or

18  her recommendation to procure marijuana in violation of federal

19  law would not, without more, be sufficient to trigger aiding and

20  abetting liability.  Id. at 635-36.  The district court noted

21  earlier that there are lawful and legitimate responses to a

22  medical marijuana recommendation.  The patient, armed with the

23  doctor's recommendation, may urge the federal government to

24  change the law.  Conant v. McCaffrey, 2000 WL 1281174 at *14

25  (N.D. Cal. Sept. 7, 2000) (noting that "many patients depend

26  upon discussions with their physicians as their primary and only

14

1  source of sound medical information").[1]

2      <u>Conant</u> further rejected the government's argument that the

3  injunction against investigations of physicians would hamper law

4  enforcement efforts.  "Because a doctor's recommendation does

5  not itself constitute illegal conduct, the portion of the

6  injunction barring investigations solely on that basis does not

7  interfere with the federal government's ability to enforce its

8  laws."  <u>Conant</u>, 309 F.3d at 636.  Furthermore, the <u>Conant</u>

9  injunction does not bar investigations where the government has

10  a good faith belief that it has substantial evidence of criminal

11  conduct.  <u>Id.</u>

12      Although <u>Conant</u> arose against the backdrop of a federal

13  policy of revoking the drug prescription licenses of doctors who

14  recommended marijuana, its holding, contrary to the federal

15  defendants' portrayal, is not limited to license revocation.

16  Rather, the district court also forbade any investigation of a

17  doctor solely on the basis that he or she recommended medical

18  marijuana.  In other words, an investigation motivated by

19  disagreement with the doctor's speech, even if not directly

20  connected to the ultimate objective of license revocation, is

21  nevertheless barred by the <u>Conant</u> injunction.[2]

22  _____

23      [1] Alternately, the patient may lawfully procure marijuana with
    the  recommendation  by  enrolling  in  a  federally-approved
24  experimental marijuana therapy program or traveling to a country
    where marijuana is legal.  <u>Conant</u>, 2000 WL 1281174 at *15.

25      [2] To be clear, however, plaintiff need not seek relief in the
26  Northern  District  of  California,  where  the  injunction  was
    originally issued.  Although, as described above, the rule of

1        **2. Elements of Retaliatory Investigation Claim**

2        In order to prove a retaliatory investigation claim,

3   plaintiff must demonstrate that (1) defendants possessed an

4   impermissible motive to interfere with his First Amendment

5   rights, (2) that defendants' conduct would chill a physician of

6   ordinary firmness from future First Amendment activities, and

7   (3) that the defendants would not have engaged in the conduct in

8   question but for the retaliatory motive.  See Mendocino Envtl.

9   Ctr. v. Mendocino County, 192 F.3d 1283, 1300 (9th Cir. 1999);

10  Hartman v. Moore, 126 S. Ct. 1695, 1703 (2006).  Although

11  defendants claim, as an initial matter, that plaintiff has not

12  even alleged that he was investigated, the complaint, fairly

13  read, encompasses such an allegation.  Compl. ¶ 1 ("[D]efendants

14  have been accused by Plaintiff of implementing and enforcing an

15  investigative practice and policy which is designed to, and

16  resulted in, the violation of Plaintiff's constitutional rights,

17  as articulated in the case of Conant v. Ashcroft.").

18        **a. Motive**

19        First, defendants maintain that the purpose of the

20  undercover visits was not to investigate plaintiff, but merely

21  to obtain written marijuana recommendations so that they could

22  _____

23  Conant forbids investigations motivated by retaliation, the facts
    of this case are not identical to those in Conant for the simple
24  reason that this is not a license revocation case.  Furthermore,
    the parties between this case and Conant are not identical.  Dr.
25  Denney has sued state officials in addition to federal officials,
    and has named federal defendants not party to Conant (e.g., the
26  Bureau of Alcohol, Tobacco, Firearms, and Explosives).

1   buy marijuana at Dixon Herbs and make a criminal case against

2   Ron Dixon.  As support, they note that a Redding Police

3   Department CI who had previously attempted to enter Dixon Herbs

4   without a recommendation was barred from doing so.  SUF ¶ 5.

5   Furthermore, the DEA CS only went to plaintiff's office after

6   being first turned away from Dixon Herbs and then referred to

7   plaintiff's office.  Compl. ¶¶ 9-10; SUF ¶ 7.

8       In response, plaintiff argues that the visits to his office

9   bore all the traditional hallmarks of investigation.  For

10  example, plaintiff notes that when the CI was in the medical

11  office, an agent was outside conducting surveillance.

12  Furthermore, although a covert transmitter and monitoring device

13  was not used, it was at least considered.  Additionally, the CI

14  was searched before and after the office visit, the police

15  report described the incident as a "controlled buy of a

16  marijuana prescription," and recorded funds were used.  Ex. G.

17      While there may have been other reasons for the defendants'

18  meticulous care in procuring a marijuana recommendation from

19  plaintiff and preserving an ostensible chain of custody,[3] there

20  is at least a genuine dispute that defendants were investigating

21  plaintiff.  This is true in spite of the declaration of Dennis

22  Hale, the federal case agent, which states that there has been

23

24      [3] For example, defendants argue that the surveillance was
    conducted because of agency procedures requiring backup for agents
25  working undercover.  See Hale Decl. ¶ 11.  In addition, defendants
    maintain that the funds were recorded to prevent the CS from
26  thinking that he or she could steal them.

17

1   no investigation of plaintiff.  Decl. of Dennis Hale ("Hale

2   Decl.") ¶ 28.   The intent to inhibit speech, like the existence

3   of a conspiracy, can be demonstrated here through direct or

4   circumstantial evidence, <u>Mendocino</u>, 192 F.3d at 1301-02, and,

5   here, the circumstances at least permit the inference that

6   plaintiff was under investigation for his speech concerning

7   medical marijuana.

8       This is so because, "[q]uestions involving a person's state

9   of mind . . . are generally factual issues inappropriate for

10  resolution by summary judgment."  <u>Braxton-Secret v. A.H. Robins</u>

11  <u>Co.</u>, 769 F.2d 528, 531 (9th Cir. 1985); <u>see</u> <u>also</u> <u>Vucinich v.</u>

12  <u>Paine, Webber, Jackson & Curtis, Inc.</u>, 739 F.2d 1434, 1436 (9th

13  Cir. 1984) ("Summary judgment is generally inappropriate when

14  mental state is an issue, unless no reasonable inference

15  supports the adverse party's claim.").  Clearly, the motivation

16  of those ordering the investigation goes to their state of mind,

17  and thus is ordinarily inappropriate for resolution on summary

18  judgment.

19      This remains a factual dispute even if, as the federal

20  defendants argue, they had not heard of Dr. Denney until a man

21  at Dixon Herbs referred the CS to plaintiff's office.  Hale

22  Decl. ¶ 5.  Although under such circumstances, it appears fairly

23  clear that Dr. Denney was not the target of the investigation

24  when it began, this does not foreclose the possibility that the

25  investigation expanded to include him once the CS was referred

26  by Dixon Herbs to plaintiff's office.  What matters, for

                                18

purposes of making out a First Amendment violation, is that the officials possessed a retaliatory animus at the time the CS and undercover agent visited plaintiff's office.

Plaintiff has also pled and proven sufficient facts regarding the existence of conspiratorial agreement at the present juncture.  As with the existence of retaliatory motive, the existence of an agreement or meeting of the minds may be inferred from circumstantial evidence.  See Mendocino, 192 F.3d at 1301.  Here, plaintiff has identified the specific defendants allegedly involved, the nature and time of the alleged investigative activities (sending in a CS on September 21, 2005 and an undercover agent on November 9, 2005), and the manner in which plaintiff was affected.  This is a sufficient factual allegation from which a fact-finder could infer the existence of a conspiracy.

### b. Chilling of Speech

Second, defendants argue that plaintiff has not pled nor proven that a physician of ordinary firmness would be deterred from speaking about medical marijuana in light of two undercover visits.  Defendants assert that "the physician has nothing to fear so long as the physician is . . . not running a script mill but engaging in the practice of medicine."  Defs.' Mot. at 23 (internal quotes omitted).

This turns the holding of Conant on its head.  Defendants' argument, if carried to its logical conclusion, would mean that the injunction in Conant was unnecessary.  Because a physician's

1  recommendation of medical marijuana to a patient is not illegal,

2  they should also have nothing to fear from an investigation.

3  The problem, however, is that a physician of ordinary firmness

4  who was only engaging in lawful speech concerning medical

5  marijuana could, in fact, be chilled by a federal investigation.

6  As Judge Kozinski noted in his concurrence in <u>Conant</u>,

7  "[p]hysicians are particularly easily deterred by the threat of

8  governmental investigation and/or sanction from engaging in

9  conduct that is entirely lawful and medically appropriate," in

10 part because an investigation may harm a physician's reputation.

11 309 F.3d at 640 n.2.  Here, the question of whether or nor a

12 physician of ordinary firmness would be chilled by two

13 undercover visits is, at the least, an issue on which reasonable

14 minds could disagree.

15            **c. Causation**

16       Third, defendants argue that the element of causation is

17 lacking.  Plaintiff must plead and prove that the challenged

18 investigative activities would not have been undertaken but for

19 the defendants' retaliatory animus.  <u>See</u> <u>Hartman v. Moore</u>, 126

20 S. Ct. 1695, 1703-04 (2006) ("[T]he causation is understood to

21 be but-for causation, without which the adverse action not have

22 been taken; we say that upon a prima facie showing of

23 retaliatory harm, the burden shifts to the defendant official to

24 demonstrate that even without the impetus to retaliate he would

25

26

1  have take the action complained of.").[4]  Although previous Ninth

2  Circuit law suggested that plaintiffs need only prove that the

3  retaliatory animus was a "substantial or motivating factor," <u>see</u>

4  <u>Mendocino</u>, 192 F.3d at 1300; <u>Sloman v. Tadlock</u>, 21 F.3d 1462,

5  1469 (9th Cir. 1994), it appears that <u>Hartman</u> has elevated the

6  requisite standard to but-for causation.

7      Here, defendants maintain that they would have sent the

8  undercover visitors to plaintiff's office even without the

9  alleged retaliatory motive.  They note that they needed a

10  medical marijuana recommendation in order to purchase marijuana

11  from Dixon Herbs, and that it was Dixon Herbs who referred the

12  CS to plaintiff's office.  In short, defendants argue that there

13  is no chain of causation to connect the alleged unconstitutional

14

15      [4] The court declines to adopt the more stringent probable
cause standard urged by defendants.  In <u>Hartman</u>, the Supreme Court
16  held that plaintiffs alleging retaliatory prosecution claims were
required to prove that the prosecutor lacked probable cause, rather
17  than merely that the retaliatory action would have been taken
absent a retaliatory motive.  126 S. Ct. at 1704-05. This is
18  because prosecutors are entitled to absolute immunity, and the
defendant in a retaliatory prosecution case is typically a non-
19  prosecutor, such as an inspector, who may have induced the
prosecution decision but did not make it himself.  Due to this
20  attenuated chain, plaintiffs must prove the absence of probable
cause to bridge the gap between the official's motive and the
21  prosecutor's action.
      Here, however, the problem of multi-layered causation does not
22  exist.  The officials charged with having a retaliatory motive are
the same officials who conducted the investigation of Dr. Denney's
23  office.  Accordingly, the heightened probable cause standard is
inappropriate here.  <u>See</u> <u>Skoog v. County of Clackamas</u>, 469 F.3d
24  1221, 1234 (9th Cir. 2006) ("Causation [] turns on [defendant's]
actions alone and no 'bridge' between motive and action is
25  necessary.  Thus, the rationale for requiring the pleading of no
probable cause in <u>Hartman</u> is absent here.  This case presents an
26  ordinary 'retaliation' claim.").

21

1  motive with the undercover visits.

2      Plaintiff responds that there were other methods of

3  investigation available that would not have abridged plaintiff's

4  First Amendment rights.  For example, plaintiff maintains that

5  defendants could have forged a medical marijuana recommendation,

6  just as law enforcement creates false identity documents for

7  undercover agents.  Alternately, plaintiff suggests that law

8  enforcement could have openly enlisted plaintiff's assistance

9  without fraud or deception.  Plaintiff also argues that the

10  defendants' assertion that they would have conducted their

11  investigation in the same way absent a retaliatory motive is

12  self-serving and therefore unreliable.

13      Given the present record before the court, and the absence

14  of any discovery, the court finds that discovery may reveal

15  sufficient factual disagreement to render summary judgment

16  inappropriate.  Admittedly, the alternate investigative

17  techniques cited by plaintiff appear somewhat questionable.  The

18  use of a forged marijuana recommendation could be exposed by a

19  confirmation phone call to Dr. Denney's office.[5]  Nevertheless,

20  perhaps Dixon Herbs did not have a practice of verifying

21  recommendations, or perhaps the use of a forged recommendation

22  would have the superior investigative choice (taking into

23  _____

24      [5] Defendants also suggest that it was impossible to forge the
recommendation because they had never seen one before, but have not
provided evidence on this issue.  The declaration of Resident Agent

25  in Charge Scott Hoernke simply stated that "[t]he investigation
needed a genuine recommendation to gain entree into Dixon Herbs."

26  Hoernke Decl. ¶ 8.

22

1  account all the advantages, disadvantages, and relative burdens

2  of using undercover visits versus using a forged recommendation)

3  but for a retaliatory motive.

4      Similarly, the open enlistment of plaintiff's assistance

5  might have compromised the secrecy of the investigation.  See

6  Hoernke Decl. ¶ 9 (describing the open solicitation of Dr.

7  Denney's cooperation as "not a good suggestion").  Nevertheless,

8  plaintiff is entitled to develop an evidentiary basis to support

9  his claim that this was a superior investigative technique that

10 would have been selected but for defendants' retaliatory motive.

11 Additionally, even if defendants prove that obtaining a

12 recommendation from a doctor by the use of fraud was the

13 soundest path to obtaining a conviction against Dixon Herbs,

14 plaintiff might be able to prove that there was another doctor

15 that defendants should have used rather than plaintiff.  These

16 are all issues that require discovery, and therefore preclude

17 summary judgment at the present stage of the proceedings.

18     **3. Injunctive Relief**

19     With regard to injunctive relief, defendants argue that

20 plaintiff lacks standing and has failed to satisfy the equitable

21 requirements for injunctive relief.

22         **a. Standing**

23     In order to meet constitutional standing requirements,

24 plaintiffs must prove (1) injury in fact, (2) causation, and (3)

25 redressability.  Thomas v. Anchorage Equal Rights Comm'n, 220

26 F.3d 1134, 1139 (9th Cir. 2000).

1    With regard to injury in fact, plaintiff alleges two
2  interrelated but distinct harms.  First, plaintiff alleges that
3  the undercover visits have chilled his speech and made him
4  fearful of discussing the medical benefits of marijuana with his
5  patients.  Second, plaintiff alleges that the undercover visits
6  have made him suspicious of his patients, some of whom he has
7  turned away for fear that they were using false identification
8  provided by law enforcement.  Defendants respond that whereas
9  criminal prosecution can threaten liberty, mere investigations
10 cannot.  Furthermore, defendants argue that suspicion and
11 anxiety do not constitute cognizable injury, as they are "the
12 type of harm which necessarily accompanies many official
13 investigations."  Hunter v. SEC, 879 F. Supp. 494, 502 (E.D. Pa.
14 1995).

15   The court disagrees.  If harm to a doctor's ability to
16 "speak frankly and openly to patients," Conant, 309 F.3d at 636,
17 was not a cognizable injury, the Conant injunction would never
18 have issued in the first instance.  See also Cal. Pro-Life
19 Council, Inc. v. Getman, 328 F.3d 1088, 1094 (9th Cir. 2003)
20 (finding, in the context of a pre-enforcement challenge, that
21 self-censorship can be a "constitutionally recognized injury").

22   With regard to causation and redressability, defendants
23 argue that because there were only two undercover visitors, and
24 neither were turned away, all of the individuals who plaintiff
25 turned away were necessarily private customers unconnected to
26 government.  Accordingly, an injunctive order directed at the

1  government would not affect the private pretenders.  While

2  plausible on its face, what this argument ignores is that Dr.

3  Denney's suspicions were roused only upon the defendants'

4  undercover visits and his discovery of the same.  These visits

5  were the but for cause of his self-censorship, and an injunction

6  would clearly restore Dr. Denney's confidence in his

7  relationships with his patients.

8              **b. Equitable Requirements**

9     Next, defendants argue that the requirements of permanent

10  injunctive relief have not been satisfied.  "A plaintiff must

11  demonstrate: (1) that it has suffered an irreparable injury; (2)

12  that remedies available at law, such as monetary damages, are

13  inadequate to compensate for that injury; (3) that, considering

14  the balance of hardships between the plaintiff and defendant, a

15  remedy in equity is warranted; and (4) that the public interest

16  would not be disserved by a permanent injunction."  eBay, Inc.

17  v. MercExchange, LLC, 126 S. Ct. 1837, 1839 (2006).

18     Again, it appears that many of defendants' arguments were

19  rejected, at least implicitly, by Conant.  For example,

20  defendants argue that emotional distress caused by an

21  investigation is not irreparable harm, citing Evenson v. Ortega,

22  605 F. Supp. 1115, 1121 (D. Ariz. 1985), but the harms of an

23  investigation were sufficiently irreparable to justify the

24  injunction upheld in Conant.  Damages would be an inadequate

25  remedy because they could not reassure Dr. Denney that similar

26  investigative tactics will not be used in the future.

1  Furthermore, the balancing of hardships has already been

2  undertaken, and the public interest taken into account, by the

3  Conant court's upholding of the injunction.

4        **4.  Qualified Immunity**

5        Defendants also argue that they are entitled to qualified

6  immunity.  "Government officials performing discretionary

7  functions generally are shielded from liability for civil

8  damages insofar as their conduct does not violate clearly

9  established statutory or constitutional rights of which a

10  reasonable person would have known."  Harlow v. Fitzgerald, 457

11  U.S. 800, 818 (1982).  In analyzing claims involving qualified

12  immunity, courts engage in a two-part test.  First, the court

13  must determine if, in the light most favorable to party

14  asserting injury, the official's conduct violated a

15  constitutional right.  Saucier v. Katz, 533 U.S. 194, 201

16  (2001).  Second, the court must determine whether that right was

17  clearly established.  Id. at 202.  If there were substantial

18  grounds for the official to have concluded that he had

19  legitimate justification under the law for acting as he did, the

20  plaintiff is not entitled to damages.

21        As set forth above, plaintiff has stated a claim for the

22  violation of a constitutional right.  Furthermore, and contrary

23  to defendants' assertion, the court need not "extend" Conant to

24  cover investigative acts; rather, the holding of Conant plainly

25  encompassed investigative acts that were motivated by

26  disagreement with a doctor's speech and beliefs.  The

1   distinction that defendants attempt to draw between an

2   investigation prompted by DEA license revocation proceedings and

3   a criminal investigation is immaterial.  The holding of <u>Conant</u>

4   (as opposed to a technical reading of its actual injunction)

5   forbade investigations generally, not those limited to a

6   particular setting.  Accordingly, the defendants are not

7   entitled to qualified immunity.

8   **B. Due Process**

9        Plaintiff alleges that defendants have violated his right

10  to due process by depriving him of his right to free speech and

11  his liberty interests in his reputation and medical practice.

12  The Due Process Clause guarantees two types of due process:

13  procedural and substantive.  <u>See</u> <u>Collins v. City of Harker</u>

14  <u>Heights</u>, 503 U.S. 115, 125 (1992).  Procedural due process

15  provides "a guarantee of fair procedure in connection with any

16  deprivation of life, liberty, or property" by the government.

17  <u>Id.</u>  Substantive due process "protects individual liberty

18  against certain government actions regardless of the fairness of

19  the procedures used to implement them."  <u>Id.</u> (internal quotation

20  marks omitted).  Specifically, the substantive component of the

21  Due Process Clause "forbids the government from depriving a

22  person of life, liberty, or property in such a way that 'shocks

23  the conscience' or 'interferes with rights implicit in the

24  concept of ordered liberty.'"  <u>Squaw Valley Dev. Co. v. Goldberg</u>,

25  375 F.3d 936, 948 (9th Cir. 2004) (quoting <u>Nunez v. City of Los</u>

26  <u>Angeles</u>, 147 F.3d 867, 871 (9th Cir. 1998) (quoting <u>United</u>

27

1  States v. Salerno, 481 U.S. 739, 746 (1987)).  Here, plaintiff

2  alleges that his substantive due process rights have been

3  violated.  "As a threshold matter, 'to establish a substantive

4  due process claim a plaintiff must . . . show a government

5  deprivation of life, liberty, or property.'"  Squaw Valley, 375

6  F.3d at 948 (quoting Nunez, 147 F.3d at 871).

7      **1. Plaintiff's Interest in Free Speech**

8      First, plaintiff alleges that defendants have violated his

9  right to due process by chilling his free speech.  However, an

10 infringement of the right to free speech cannot provide the

11 basis for a violation of due process.  The Supreme Court has

12 held that "where a particular amendment 'provides an explicit

13 textual source of constitutional protection' against a particular

14 sort of government behavior, 'that Amendment, not the more

15 generalized notion of "substantive due process," must be the

16 guide for analyzing these claims.'"  Albright v. Oliver, 510 U.S.

17 266, 273 (1994) (Rehnquist, C.J., for plurality) (quoting Graham

18 v. Connor, 490 U.S. 386, 395 (1989)).  Since the First Amendment

19 provides explicit protection for the right to free speech, which

20 plaintiff claims has been chilled, plaintiff may not

21 additionally base a due process claim on a violation of his

22 right to free speech.

23     **2. Plaintiff's Interest in his Reputation and Medical**

24 **Practice**

25     Second, plaintiff alleges that defendants' undercover

26 investigation has injured his reputation and practice and,

28

1   therefore, violated his right to due process.   Reputation by

2   itself is not a liberty interest protected by the Fifth

3   Amendment.   <u>Siegert v. Gilley</u>, 500 U.S. 226, 233 (1991); <u>Paul v.</u>

4   <u>Davis</u>, 424 U.S. 693, 708-09 (1976).   However, "the right to hold

5   specific private employment and to follow a chosen profession

6   free from unreasonable governmental interference comes within

7   the 'liberty' and 'property' concepts of the Fifth Amendment."

8   <u>Greene v. McElroy</u>, 360 U.S. 474, 492 (1959).   The liberty

9   guaranteed by the Fifth Amendment includes the right "to engage

10  in any of the common occupations of life," <u>Meyer v. Nebraska</u>,

11  262 U.S. 390, 399 (1923), as well as "some generalized due

12  process right to choose one's field of private employment,"

13  subject to reasonable government regulation.   <u>Connecticut v.</u>

14  <u>Gabbert</u>, 526 U.S. 286, 291-92 (1999) (citing <u>Dent v. West</u>

15  <u>Virginia</u>, 129 U.S. 114 (1889) (upholding a requirement of

16  licensing before a person can practice medicine); <u>Truax v.</u>

17  <u>Raich</u>, 239 U.S. 33, 41 (1915) (invalidating on equal protection

18  grounds a state law requiring companies to employ 80% United

19  States citizens)).

20        Generally, however, the liberty interest to hold specific

21  private employment has been afforded substantive due process

22  protection only when the government completely prohibits, rather

23  than briefly interrupts, a person from engaging in his chosen

24  profession.   <u>Gabbert</u>, 526 U.S. at 292.   Further, this right "is

25  simply not infringed by the inevitable interruptions of our

26  daily routine as a result of legal process which all of us may

29

1   experience from time to time." Id.  In Gabbert, the Supreme

2   Court held that a lawyer's "Fourteenth Amendment right to

3   practice one's calling is not violated by the execution of a

4   search warrant, whether calculated to annoy or even to prevent

5   consultation with a grand jury witness." Id. at 293.

6   Following Gabbert, the Ninth Circuit held in Lowry v. Barnhart

7   that an "indirect and incidental burden on professional practice

8   is far too removed from a complete prohibition to support a due

9   process claim." Lowry v. Barnhart, 329 F.3d 1019, 1023 (9th

10  Cir. 2003) (footnote omitted).  In Lowry, a lawyer claimed that

11  an administrative law judge was biased against him and the bias

12  violated his constitutional due process right to practice his

13  profession.  Id.  The Ninth Circuit reasoned that although the

14  judge's "alleged interference with Lowry's practice does not

15  share the brevity of the interference in Gabbert, . . . it is

16  similar in severity in that both fall far short of a complete

17  prohibition.  Lowry doesn't claim that [the judge] barred him

18  from retaining clients or appearing at hearings.  At worst, he

19  may have a harder time finding clients because of his losing

20  track record." Id.

21      In the case at bar, plaintiff alleges that defendants'

22  undercover investigation has injured his practice.

23  Specifically, the complaint alleges that plaintiff "has become

24  suspicious of his patients, and has been forced to turn away

25  patients he fears may be using false identification provided by

26  law enforcement." Compl. ¶ 21.  As in Gabbert and Lowry, this

30

1   appears to fall short of a complete prohibition.  Plaintiff has

2   only alleged that he has had to turn away some patients, not

3   that he has been completely precluded from the practice of

4   medicine.  Thus, it would appear that plaintiff has not

5   identified a liberty interest protected by substantive due

6   process.  The court therefore dismisses plaintiff's due process

7   claim.

8   **C. Equal Protection**

9       Plaintiff asserts a Fifth Amendment Equal Protection claim

10  based on chilling of his First Amendment right to free speech.

11  "[While] the Fifth Amendment contains no equal protection

12  clause, it does forbid discrimination that is 'so unjustifiable

13  as to be violative of due process.'"  <u>Weinberger v. Wiesenfeld</u>,

14  420 U.S. 636, 638 (1975) (quoting <u>Schneider v. Rusk</u>, 377 U.S.

15  163, 168 (1964); citing <u>Bolling v. Sharpe</u>, 347 U.S. 497, 499

16  (1954)).  The court analyzes a Fifth Amendment equal protection

17  claim in the same way it analyzes an equal protection claim

18  under the Fourteenth Amendment.  <u>Id.</u>

19      There are two steps in analyzing an equal protection claim.

20  First, plaintiff "must show that the statute in question 'results

21  in members of a certain group being treated differently from

22  other persons based on membership in that group.'"  <u>Sagana v.</u>

23  <u>Tenorio</u>, 384 F.3d 731, 740 (9th Cir. 2004) (citing <u>United States</u>

24  <u>v. Lopez-Flores</u>, 63 F.3d 1468, 1472 (9th Cir. 1995)).  Second,

25  the court determines the appropriate level of scrutiny to apply

26  and evaluates the legitimacy of the discriminatory government

1  action under that standard.  _Id._  "Laws alleged to violate the

2  equal protection clause are generally subject to one of three

3  levels of 'scrutiny' by courts: strict scrutiny, intermediate

4  scrutiny, or rational basis review.  Laws are subject to strict

5  scrutiny when they discriminate against a suspect class, such as

6  a racial group, or when they discriminate based on any

7  classification but impact a fundamental right, such as the right

8  to vote."  _Tucson Woman's Clinic v. Eden_, 379 F.3d 531, 543 (9th

9  Cir. 2004) (citing _Grutter v. Bollinger_, 539 U.S. 306, 326

10  (2003); _Reynolds v. Sims_, 377 U.S. 533, 562 (1964)).

11      The First Amendment right to free speech is such a

12  fundamental right.  _Police Dep't of Chicago v. Mosley_, 408 U.S.

13  92, 101 & n.8 (1972).  In _Mosely_, the Supreme Court held that

14  "[t]he Equal Protection Clause requires that statutes affecting

15  First Amendment interests be narrowly tailored to their

16  legitimate objectives."  _Id._ at 101 (citing _Williams v. Rhodes_,

17  393 U.S. 23 (1968); _Dunn v. Blumstein_, 405 U.S. 330, 342-43

18  (1972)).  The court held that an ordinance prohibiting picketing

19  on all but one subject was not narrowly tailored to prevent

20  disruption.  _Id._  The court then noted, "In a variety of

21  contexts we have said that 'even though the governmental purpose

22  be legitimate and substantial, that purpose cannot be pursued by

23  means that broadly stifle fundamental personal liberties when

24  the end can be more narrowly achieved.'  This standard, of

25  course, has been carefully applied when First Amendment

26  interests are involved."  _Id._ at 101 n.8 (citations omitted).

1  Since the First Amendment right to free speech is a fundamental

2  right, the court applies strict scrutiny to laws impacting First

3  Amendment rights and discriminating based on any classification.

4  See Tucson Woman's Clinic, 379 F.3d at 543.  Government actions

5  subject to strict scrutiny "will be sustained only if they are

6  suitably tailored to serve a compelling state interest."  See

7  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440

8  (1985).

9     In the case at bar, plaintiff alleges that defendants

10  discriminated against him based on his support for medical

11  marijuana and by conspiring to investigate him and infiltrate

12  his medical practice.  While doctors who recommend marijuana do

13  not comprise a suspect class under equal protection, plaintiff

14  also alleges that defendants have infringed his fundamental

15  right to free speech.  Since plaintiff has pled a claim that he

16  has been discriminated against in a way that impacts a

17  fundamental right, the court applies strict scrutiny to the

18  challenged government action.  Government actions subject to

19  strict scrutiny "will be sustained only if they are suitably

20  tailored to serve a compelling state interest."  See City of

21  Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).

22     Defendants' stated purpose for "visiting plaintiff was to

23  get written marijuana regulations acceptable to Dixon Herbs."

24  Defs.' Mot. at 29.  Plaintiff argues that defendants' method of

25  obtaining a marijuana recommendation to gain access to Dixon

26  Herbs was not narrowly tailored because there were readily

available "alternative law enforcement techniques that could

have been implemented by defendants." Pl.'s Opp'n at 34.  As

stated above, the alternative investigative techniques cited by

plaintiff appear somewhat questionable.  However, there is at

least a reasonably founded hope that plaintiff may develop an

evidentiary basis to support his claim that alternate methods

could have been employed that would have had the same efficacy

in achieving the investigation's stated purpose, and that would

not have compromised the safety or welfare of those involved.

**D.  § 1985(3)**

       Plaintiff alleges that defendants violated 42 U.S.C. §

1985(3) by conspiring to infiltrate his medical practice and

thereby deprive him of due process and equal protection of the

law.  To state a claim under 42 U.S.C. § 1985(3), a plaintiff

must allege that defendants acted from "some racial, or perhaps

otherwise class-based, invidiously discriminatory animus" in

conspiring to deprive him of equal protection of the laws, or of

equal privileges and immunities under the laws.  <u>Griffin v.

Breckenridge</u>, 403 U.S. 88, 102-03 (1971).  The Ninth Circuit has

"extended [section 1985(3)] beyond race only when the class in

question can show that there has been a governmental

determination that its members require and warrant special

federal assistance in protecting their civil rights."  <u>Schultz

v. Sundberg</u>, 759 F.2d 714, 718 (9th Cir. 1985) (internal

quotation marks omitted).  There are only two ways to show such

a governmental determination: "we require either that the courts

1    have designated the class in question a suspect or quasi-suspect
2    classification requiring more exacting scrutiny or that Congress
3    has indicated through legislation that the class required
4    special protection." Id. (citation omitted).

5        Plaintiff alleges that defendants conspired to violate his
6    rights and the conspiracy "was motivated [b]y a discriminatory
7    animus against physicians who support the medical use of
8    cannabis." Compl. ¶ 29.  Additionally, plaintiff argues that
9    the Conant injunction is a governmental determination that
10   physicians who support the medical use of cannabis require and
11   warrant special federal assistance in protecting their civil
12   rights.

13       The Conant injunction, however, does not fall in one of the
14   categories the Ninth Circuit requires for a governmental
15   determination.  It is not a designation by the courts that the
16   class is a suspect or quasi-suspect classification requiring
17   more exacting scrutiny.  Nor is it an indication from Congress
18   through legislation that the class requires special protection.
19   Without a governmental determination that physicians who support
20   the medical use of marijuana warrant special federal assistance
21   to protect their civil rights, plaintiff cannot make out an
22   essential element of a § 1985(3) claim, that defendants acted
23   from a class-based discriminatory animus.  See Schultz, 759 F.2d
24   at 718 (plaintiff failed to state a claim because there was no
25   governmental determination that a "transitory coalition of state
26   representatives" merited special protection); Sever v. Alaska

1  <u>Pulp Corp.</u>, 978 F.2d 1529, 1538 (9th Cir. 1992) (no governmental

2  determination for "individuals who wish to petition the

3  government").  The court dismisses plaintiff's section 1985(3)

4  claim.

5  **E. § 1986**

6      "Section 1986 imposes liability on every person who knows

7  of an impending violation of section 1985 but neglects or

8  refuses to prevent the violation."  <u>Karim-Panahi v. Los Angeles</u>

9  <u>Police Dep't</u>, 839 F.2d 621, 626 (9th Cir. 1988) (citation

10  omitted).  As the parties note, "[a] claim can be stated under

11  section 1986 only if the complaint contains a valid claim under

12  section 1985."  <u>Id.</u>  Since plaintiff has failed to state a claim

13  under section 1985(3), he has also failed to state a claim under

14  section 1986.  Plaintiff's section 1986 claim is dismissed.

15                        **IV. Conclusion**

16      The motion to dismiss and motion for summary judgment are

17  DENIED with respect to the First Amendment and equal protection

18  claims, and GRANTED with respect to the due process claim, the §

19  1985 claim, and the § 1986 claim.  The application for a

20  continuance under Rule 56(f) is GRANTED.

21      IT IS SO ORDERED.

22      DATED:  August 14, 2007.

23

24                             LAWRENCE K. KARLTON

25                             SENIOR JUDGE

                           UNITED STATES DISTRICT COURT

26