UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PHILIP A. DENNEY,

                         NO. CIV.S-06-1711 LKK/GGH

      Plaintiff,

   v.                       O R D E R

DRUG ENFORCEMENT
ADMINISTRATION, et al

      Defendants.

_____/

    Plaintiff Phillip Denney is a California physician who claims that he was investigated by defendant law enforcement officials in connection with his practice of recommending medical marijuana to patients.  In the alleged investigation, a confidential informant and undercover federal agent posed as patients and obtained medical marijuana recommendations from plaintiff. Defendants maintain that they obtained the recommendations in order to procure marijuana from a marijuana dispensary, the only target of their investigation. Plaintiff alleges that defendants' conduct violated his First Amendment and equal protection rights.  Pending before

the court are two motions for summary judgment, one filed by the federal defendants and one filed by the state defendants.   The court resolves the matter upon the parties' papers and after oral argument.  For the reasons explained below, the motions for summary judgment are granted.

## I. Factual Background[1]

### A. Plaintiff

Plaintiff received his medical degree from the University of Southern California in 1976.   Denney Dep. 19:22-24.   After obtaining his degree, plaintiff spent a number of years in family practice and in emergency and occupational medicine before starting a practice focused principally on medical marijuana.  Id. at 33:5-25.  Plaintiff remains in good standing with the California medical board and has never been subject to disciplinary action.   Id. at 46:4-5.

Plaintiff currently sees patients in offices located in Redding and Carmichael, California.  Id. at 65:13-21.  Defendants' two visits to plaintiff's Redding office are at issue in the current action.

### B. Defendants

Plaintiff has named both federal and state defendants in this action.   The federal defendants include the Drug Enforcement Administration ("DEA"), DEA Administrator Karen Tandy, Special Agent Dennis Hale, the Federal Bureau of Alcohol, Tobacco,

---

[1] The facts are undisputed unless otherwise noted.

2

Firearms, and Explosives ("ATF"), ATF Director Carl J. Truscott, and Agent Steven Decker.  The state defendants include the Office of the Shasta County District Attorney, District Attorney Gerald Benito, the Shasta County Sheriff's Department, Shasta County Sheriff James Pope, Deputy Robert Modin, Deputy Christopher McQuillan, the Redding Police Department, Redding Police Chief Leonard Moty, Officer Tracy Miller, and Officer Eric Wallace.

**C. Four Controlled Buys**

In 2005, the Redding Police Department ("RPD") began investigating Dixon Herbs, a marijuana dispensary, for the sale of marijuana.  Federal Defs.' Statement of Undisputed Facts ("FSUF") ¶¶ 1-2.  RPD Officer Tracy Miller led the investigation.  Id. ¶ 3. Shortly after the investigation began, the DEA became involved, assigning Special Agent Dennis Hale to oversee federal involvement. FSUF ¶ 16.  Although the DEA decided against federal prosecution, Hale indicated that the DEA could nevertheless assist in the investigation.  Miller Dep. 79:18-23.

Both federal and state investigators believed the investigation's success depended on making several marijuana buys from Dixon Herbs.  FSUF ¶ 9; State Defs.' Statement of Undisputed Material Facts ("SSUF") ¶ 5.  Shasta County District Attorney Gerald Benito stated that he "told the officers that we would need to have an extremely solid case with several good buys" in order to prosecute Dixon Herbs.  Benito Dep. 56:8-11.  It was the understanding of both RPD Officer Miller and Special Agent Hale that four controlled buys were necessary for a successful

prosecution of Dixon Herbs, with one buy from an undercover officer, who would be less vulnerable to impeachment at trial. Miller Dep. 47:8-10; Hale Dep. 52:22-23.

First, Officer Miller utilized a confidential informant ("CI") named Cooksey already in possession of a doctor's recommendation[2] to make the first buy of the investigation on September 7, 2005.[3] FSUF ¶¶ 32, 37. After this initial marijuana buy, however, defendants were unable to find another CI with a doctor's recommendation in the Redding area. FSUF ¶¶ 31, 32. There was a CI in the Sacramento area who had a recommendation, but he was not used "as a matter of convenience," given the added travel time that would be required. Hale Dep. 68:1-4.

Second, defendants next attempted to have another CI, Barone, make a buy without a recommendation on September 15, 2005. FSUF ¶ 40. Dixon Herbs staff refused to sell to Barone due to his lack of a recommendation, but advised him to return on October 9, 2005, when a clinic would be conducted on-site at which Barone could obtain a recommendation. FSUF ¶¶ 40, 42. Barone returned and

---

[2] The process of obtaining a doctor's recommendation for medical marijuana stems from California's Compassionate Use Act. That act states that its purpose is "[t]o ensure seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of" serious illness. Cal. Health & Safety Code § 11362.5.

[3] Cooksey made an additional buy from Dixon Herbs on October 6, 2005 because there was a malfunction with the transmitter-recorder during the first buy on September 7, 2005. FSUF ¶¶ 39, 54.

obtained the recommendation on October 9, 2005 at the on-site clinic from Dr. Rosenthal.  FSUF ¶ 6.  Barone then used the recommendation to purchase marijuana from Dixon Herbs on October 11, 2005.  Id. ¶ 65.

Third, defendants tried again to have another CI, McQueen, attempt to purchase marijuana from Dixon Herbs without a doctor's recommendation on September 20, 2005.  Id. ¶ 43.  Like Barone, McQueen was unsuccessful because he lacked a recommendation.  Id. Dixon Herbs staff did not inform McQueen about the October 9, 2005 clinic.  Miller Dep. 82:17-83:1.  Instead, a staff member at Dixon Herbs advised McQueen to visit plaintiff in order to obtain a recommendation.  FSUF ¶ 45.  McQueen visited plaintiff's office the next day and obtained a recommendation for medical marijuana, which, like all of plaintiff's recommendations, bore an embossed seal.   FSUF ¶ 52.   McQueen then returned to Dixon Herbs on September 27, 2005 and purchased marijuana using the recommendation obtained from plaintiff.  FSUF ¶ 53.

Fourth, ATF Agent Steve Decker ("Decker") carried out the final buy of the investigation on November 21, 2005.  Miller Dep. 101:7-103:6.  Officer Miller contacted Agent Decker because Decker possessed an undercover license.  Id. at 101:12-103:15.  Decker visited plaintiff's office on November 9, 2005 and obtained a recommendation using the undercover identity of Steven Hoffmaster, allegedly suffering from neck pain as the result of a motorcycle accident.  Id. at 63:17-64:25; 105:25-107:8.  Decker then used the

1   recommendation to purchase marijuana from Dixon Herbs on November

2   21, 2005.  Id. at 107:4-7.

3   **D. Procedural History**

4        Plaintiff's First Amended Complaint alleged several

5   constitutional violations by both the federal and state defendants.

6   In its August 14, 2007 order, the court granted the federal

7   defendant's motion to dismiss with respect to plaintiff's §§ 1985

8   and 1986 claims.  Denney v. Drug Enforcement Admin., 508 F. Supp.

9   2d 815, 836-37 (E.D. Cal. 2007).  The court denied the motion to

10  dismiss and motion for summary judgment with respect to the First

11  Amendment and equal protection claims.  Id. at 828-36.  In opposing

12  the motion, plaintiff argued that defendants could have taken other

13  alternatives to investigate Dixon Herbs without infringing upon

14  plaintiff's constitutional rights.  The two suggested alternatives

15  were (1) forging a recommendation and (2) openly enlisting

16  plaintiff's help -- both of which the court characterized as

17  "questionable" but nevertheless felt were issues on which the

18  plaintiff was entitled to conduct discovery.  In terms of relief,

19  plaintiff seeks an injunction preventing defendants "from

20  soliciting the professional services of Plaintiff through fraud,

21  deception and falsities," FAC Prayer for Relief ¶ 1, as well as

22  damages, id. ¶¶ 2-4.  Both federal and state defendants now move

23  for summary judgment on plaintiff's remaining claims.

24                        **II. Standard**

25       Summary judgment is appropriate when no genuine issue of

26  material fact exists.  Fed. R. Civ. P. 56(c).  Such circumstances

6

entitle the moving party to judgment as a matter of law.  <u>Id.</u>; <u>see also</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Secor Ltd. v. Cetus Corp.</u>, 51 F.3d 848, 853 (9th Cir. 1995).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the
> district court of the basis for its motion, and
> identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it
> believes demonstrate the absence of a genuine issue of
> material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id.</u> (citing Fed. R. Civ. P. 56(c)).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>Id.</u> at 522.  If a party fails completely to produce proof of a necessary element of its claim, then this "necessarily renders all other facts immaterial." <u>Id.</u>  In such circumstances, the court should grant summary judgment "so long as whatever is before [it] demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id.</u> at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any

material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but must instead tender evidence of specific facts in the form of affidavits and/or admissible discovery material in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Ass'n of Western Pulp & Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. at 248-49; see also Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

8

parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; see also T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); see also Int'l Union of Bricklayers, Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In making its determination, the court is to believe all evidence of the opposing party, see Anderson, 477 U.S. at 255, and the court must draw all reasonable inferences from the facts placed before it in favor of the opposing party, see Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); see also Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000). Nevertheless, the court does not draw untethered inferences, but instead relies on the opposing party to produce a sufficient factual predicate for such inferences. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

9

### III. Analysis

**A. First Amendment Claim**

In the prior order, the court discussed in detail <u>Conant v. Walters</u>, 309 F.3d 629 (9th Cir. 2002), which provides the basis for plaintiff's First Amendment claim.  In <u>Conant</u>, the Ninth Circuit upheld a permanent injunction enjoining the government from revoking a physician's license to prescribe controlled substances based solely on the physician's professional recommendation of the use of medical marijuana, and also from conducting an investigation of a physician based on the same impermissible motive.  <u>Id.</u> at 636. <u>Conant</u> reasoned that the First Amendment protects physicians' discussions with their patients about the advantages and disadvantages of medical marijuana.  <u>Id.</u>

<u>Conant</u> rejected arguments by the government that such an injunction would protect criminal conduct and hamper law enforcement efforts by enjoining investigations.  <u>Id.</u> at 635-36. The government may investigate physicians when substantial evidence of criminal conduct provides the basis for such an investigation. <u>Id.</u> at 636.  If, however, disagreement with the physician's speech in the form of recommending the use of medical marijuana alone provides the motivation, <u>Conant</u> bars such an investigation.

In order to prove a First Amendment retaliation claim, plaintiff must demonstrate that (1) defendants possessed an impermissible motive to interfere with his First Amendment rights, (2) defendants' conduct would have chilled a physician of ordinary firmness from future First Amendment activities, and (3) the

10

1 defendants would not have engaged in the conduct in question but
2 for the retaliatory motive.  See Hartman v. Moore, 547 U.S. 250,
3 258-60 (2006); Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d
4 1283, 1300 (9th Cir. 1999).  In short, plaintiff must prove motive,
5 chilling, and causation.

6     In the context of a retaliation claim, "causation is
7 understood to be but-for causation, without which the adverse
8 action would not have been taken."  Hartman, 547 U.S. at 260.
9 Under these conditions, once the plaintiff has made a prima facie
10 case for retaliatory harm, the defendants then have the burden to
11 demonstrate that their actions giving rise to the suit would still
12 have occurred "even without the impetus to retaliate."  Id. (citing
13 Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274,
14 287 (1977)).

15     As explained in greater detail below, plaintiff's only viable
16 theory of retaliation argues that defendants attempted to increase
17 the number of doctor's office visits ostensibly required by the
18 investigation, when in fact at least some of the visits were
19 unnecessary.  In light of the other undisputed facts, however, this
20 inference is unreasonable.  In particular, if defendants were
21 attempting to increase the number of doctor's office visits,
22 defendants would not have sent the informants to Dixon Herbs first
23 to obtain marijuana without a recommendation.  If the informants
24 had been successful, this would have avoided the need for their
25 doctor's office visits.  Instead, defendants' conduct demonstrates
26

1  that the target of their investigation was Dixon Herbs, not

2  plaintiff.

3       Plaintiff sets forth several alternatives that he contends

4  could have been used in lieu of McQueen and Decker's visits.

5  First, plaintiff asserts that defendants could have forged

6  marijuana recommendations.  Second, plaintiff contends that

7  defendants could have obtained recommendations from Dr. Rosenthal,

8  the doctor who provided a recommendation to CI Barone.  Third,

9  plaintiff maintains that defendants could have prosecuted Dixon

10 Herbs with no buys at all, relying simply on Dixon Herbs' business

11 license application as a marijuana dispensary, or that if buys were

12 needed, less than four buys would have sufficed.  Fourth, plaintiff

13 argues that defendants could have used a CI from Sacramento who

14 already possessed a marijuana recommendation.  Notably absent from

15 this list is plaintiff's original suggestion (made in opposition

16 to the motion to dismiss) that defendants could have openly

17 requested plaintiff's assistance -- a possibility that is no longer

18 availing given plaintiff's testimony that would have refused such

19 a request.[4]  SSUF ¶¶ 36, 40.

20      **1. Forged Recommendations**

21      First, a forged recommendation purportedly issued by plaintiff

22 would not have been adequate for the simple reason that it could

23 have been exposed by a confirmation call from Dixon Herbs.  While

24 _____

25 [4]  In addition, plaintiff stated that his own "ethical obligation
   as a physician to be truthful" would have prevented him from
26 writing a fake recommendation.  Denney Dep. 108:16-109:3.

the forgery itself might have been passable,[5] plaintiff admits that his office receives phone calls from persons seeking to verify his recommendations "fairly frequently" and "daily."   Denney Dep. 71:22-72:16.

Alternately, plaintiff argues that defendants could have forged a recommendation from a real physician (other than plaintiff) but listed a telephone number manned by law enforcement in the event that Dixon Herbs attempted to verify the recommendation.   But this cumbersome scheme -- in addition to lacking any evidence to support its viability -- would have required far more effort (e.g., a dedicated, full-time-staffed telephone line to vouch for forged marijuana recommendations) and risk to the investigation (e.g., individuals at Dixon Herbs, in the course of verifying recommendations, might have become familiar with the staff of doctors who recommend marijuana) than simply obtaining a recommendation from plaintiff.

Ordinarily, a question such as the viability of alternatives would be a question for the trier of fact to resolve.   Here, however, the court concludes that no reasonable trier of fact would conclude that this particular alternative was viable.   Accordingly, the court finds that a forged recommendation would not have

---

[5] Plaintiff's method of guarding against the counterfeiting of his recommendations (relying on a word processing document and an embosser purchased at an office supply store) were hardly insurmountable difficulties.   Denney Dep. 73:23-74:20.

1  presented law enforcement with a viable alternative to the

2  recommendations procured through visits to a doctor's office.

3      **2. More Recommendations from Dr. Rosenthal**

4      Second, plaintiff argues that defendants could have sent CI

5  McQueen and Agent Decker to Dr. Rosenthal (the physician who

6  conducted an on-site clinic at Dixon Herbs on October 9, 2005) as

7  an alternative to visiting plaintiff's office.  Even if a doctor's

8  recommendation was needed for the investigation, plaintiff argues

9  that defendants used him (rather than Dr. Rosenthal) because of

10  public advocacy[6] of medical marijuana.[7]  See Denney Dep. 47:6-

11  [6] This includes unspecified legislative and judicial testimony,

12  involvement in various organizations (such as the Society of
   Cannabis Clinicians, the American Alliance for Medical Cannabis,
   and the National Organization for Reform of Marijuana Laws), and

13  various letters to the editor in local publications (the names of
   which plaintiff also cannot precisely recall).  Denney Dep. 51:8,

14  50:17-19.

15  [7] The court will assume, for purposes of argument, that plaintiff
   properly alleged that such outside-of-office speech was chilled,

16  although defendants argue that plaintiff only alleged a First
   Amendment injury for speech to his patients.  The complaint

17  alleges that "[a]s a result of learning about the incidents
   described [i.e., visits to his office], Plaintiff's right to

18  explain the medical benefits of marijuana to his patients, and to
   exercise that right has been chilled."  FAC ¶ 22.  This tracks the

19  Conant complaint's retaliation allegation of "punish[ing]
   physicians for communicating with their patients about the medical

20  use of marijuana." 309 F.3d at 633.
       Defendants argue they relied on this statement in conducting

21  discovery and would be prejudiced by this late-hour sub silentio
   amendment to plaintiff's complaint.  Speziale v. Bethlehem Area

22  Sch. Dist., 266 F. Supp. 2d 366, 371 n.3 (E.D. Pa. 2003)
   ("Plaintiff's counsel cannot reasonably expect to amend the

23  complaint after the close of discovery merely by raising new
   arguments in the responsive papers.").  Nevertheless, the

24  complaint also noted, in the section describing the parties, that
   plaintiff had testified before the California Medical Board and as

25  an expert witness regarding the medical use of marijuana.
       The court need not resolve this dispute, because, as detailed

26  below, even assuming that plaintiff properly alleged injury to

53:13. Factually, however, it is important to note that defendants only sent McQueen to plaintiff's office *after* McQueen first went to Dixon Herbs, and Dixon Herbs specifically referred McQueen to plaintiff's office.  In other words, plaintiff's name never arose in the investigation until Dixon Herbs first made the referral. Nevertheless, plaintiff reasons that this referral was fortuitous for defendants, because it coincided with their desire to retaliate against him based on his outside-of-office speech.

Plaintiff bears the burden of proving that defendants had knowledge of his protected speech under Keyser and Karam.  See Keyser v. Sacramento City Unified Sch. Dist., 265 F.3d 741, 751 (9th Cir. 2001) (affirming summary judgment on defendant's declaration of lack of knowledge of a plaintiff's protected speech); Karam v. City of Burbank, 352 F.3d 1188, 1194 (9th Cir. 2003) (affirming summary judgment based on testimony that investigator was unaware of the plaintiff's statements or her history of criticizing the city).

In Keyser, the plaintiff-school official, a member of the superintendent's cabinet, complained about the superintendent's alleged misuse of federal money to the school district's Board of Trustees, which subsequently questioned the superintendent.  265 F.3d at 745.  The superintendent then allegedly retaliated against plaintiff. Nevertheless, because the superintendent testified that he was unaware that the particular cabinet member had complained

outside-of-office speech, the court would nevertheless grant summary judgment.

15

1  about him, the Ninth Circuit held that the plaintiff failed to
2  prove the necessary element of knowledge.  Id. at 751.

3      Similarly, in Karam, a case involving an alleged retaliatory
4  prosecution based upon the plaintiff's exercise of her First
5  Amendment rights, the defendant-officer claimed that he was unaware
6  of the plaintiff's exercise of her free speech rights.  352 F.3d
7  at 1194.  Despite the fact that she had a history of criticizing
8  the city, the Ninth Circuit held that inferring knowledge on this
9  basis amount to "speculation as to . . . improper motive [that]
10  does not rise to the level of evidence sufficient to survive
11  summary judgment."  Id.

12      Here, as noted earlier, McQueen was only sent to plaintiff's
13  office after Dixon Herbs first referred him to plaintiff by name.
14  That alone is powerful evidence that the visits to plaintiff's
15  office were not part of some preconceived scheme to retaliate
16  against plaintiff for his public advocacy of medical marijuana.
17  In addition, the evidence of plaintiff's reputation as a public
18  advocate based on his unspecified testimony in judicial and
19  legislative proceedings, letters to the editor, and involvement in
20  organizations is not sufficient to create the reasonable inference
21  that the particular defendants in this case were aware of
22  plaintiff's speech.  See Keyser, 265 F.3d at 745; Karam, 352 F.3d
23  at 1194.[8]

_____

24  [8] Again, whether defendants knew of plaintiff's advocacy is usually
a disputed issue of fact that might justify denying summary
25  judgment.  As noted above, however, plaintiff has the burden of
providing a factual basis for an inference.  Here, plaintiff's
26  evidence is so weak as to preclude a finding of such a basis.

### 3. No Buys or Fewer Than Four Buys

Third, plaintiff questions whether any buys were needed at all, or why less than four buys would not have sufficed for purposes of prosecuting Dixon Herbs.  With respect to the first suggestion, plaintiff hypothesizes that the Dixon Herbs' business license application alone -- submitted for a "marijuana dispens[ary]," Pl.'s Opp. Ex. 7 at 1 -- would have sufficed as proof in a criminal prosecution.  But District Attorney Benito testified that the mere operation of marijuana dispensary would not have been per se violative of state law; instead, defendants also had to prove that Dixon Herbs was not operating as a "primary caregiver," Cal. Health & Safety Code § 11362.7 (defined as "the individual, designated by a qualified patient . . .  who has consistently assumed responsibility for the housing, health, or safety of that patient or person"), and the buys from individuals who were essentially strangers to Dixon Herbs were relevant to that issue.  Benito Dep. 42:3-11.  See also Lungren v. Peron, 59 Cal. App. 4th 1383, 1397-98 (1997) (cannabis club found not to be primary caregiver where "[t]he purchasing patient may never patronize respondents' establishment again; [and] the designation of respondents as primary caregivers is admittedly transitory and not exclusive.").

Plaintiff also argues that defendants could have stopped after the first two buys (by Cooksey and Barone), avoiding altogether the second two buys (by McQueen and Decker).  Plaintiff's argument that the "four buys" requirement was fabricated relies principally upon

1  an inconsistency between the testimony of the Deputy District
2  Attorney (DDA), Benjamin Hanna, on the one hand, and the testimony
3  of Special Agent Hale and Officer Miller, on the other hand.  Hale
4  and Miller both maintain that there was a need for four buys,
5  including one by an undercover agent, as communicated by DDA Hanna.
6  Hale recorded the number of buys specified by Hanna in a "Report
7  of Investigation" dated September 15, 2005.  Hale Dep., Ex. 23 at
8  1.  Miller also recalls that Hanna stated that they needed four
9  undercover buys, including one from an undercover police officer,
10 for prosecution.  Miller Dep. 46:9-11.  DDA Hanna, however, cannot
11 recall whether or not he gave Miller and Hale a specific
12 requirement regarding the number of buys needed, but he noted that
13 giving such a number was "not the type of thing that I would
14 typically say, that I won't file this case unless you bring me X."
15 Hanna Dep. 46:1-7.

16     District Attorney Benito, DDA Hanna's superior, however, notes
17 that he also had personal contact with law enforcement officers
18 involved in the Dixon Herbs investigation.  Benito Dep. 53:16-20.
19 Benito states that when law enforcement inquired into the
20 sufficiency of evidence needed for a potential prosecution against
21 Dixon Herbs, he responded that, because of "difficulty in the past
22 with medicinal marijuana cases," the officers "would need to have
23 an extremely solid case with several buys [and] good
24 recommendations from doctors."[9]  Id. 55:22-56:13.

25 [9] It is unclear from the deposition testimony whether Benito told
26 the law enforcement officers a specific number of buys that he
   wanted, other than "several."  It does not appear that the question

1    While there is some inconsistency between the statements of

2  Miller, Hale, and Benito and those of Hanna, it is not one that

3  amounts to a genuine issue of material fact.  As detailed below,

4  the other undisputed facts in this case demonstrate that had

5  defendants fabricated a "four buys" requirement to satisfy a

6  retaliatory animus against doctors who recommend marijuana, they

7  would not have taken the other actions in the investigation that

8  they ultimately did.  Based on these facts, and the fact that DA

9  Benito would not prosecute Dixon Herbs without several buys, a

10  reasonable jury could not conclude that defendants Agent Hale and

11  Officer Miller fabricated a four buys requirement.[10]

12       **4. Confidential Informant with Preexisting Recommendation**

13       Finally, plaintiff argues that defendants could have used

14  another CI, like Cooksey, who already possessed a medical marijuana

15  recommendation.  The only such CI known to defendants was located

16  in Sacramento, and because Dixon Herbs was located in Redding,

17  defendant Hale felt that using this CI would be inconvenient.  Hale

18  Dep. 67:15-68:1-4 (use of the informant would have involved a

19  "five- or six-hour roundtrip").[11]   Drawing all reasonable

20  inferences in favor of plaintiff, however, one could conclude that

21  _____

22  was ever posed.

23  [10] Again, the fact that law enforcement sought to buy marijuana
from Dixon Herbs without a prescription negates the inference that

24  plaintiff was a target of the investigation.

25  [11] Although there is no evidence on this issue, the court presumes
that the Sacramento CI's entire role in the investigation could

26  have been accomplished in a single round-trip.

the procedures required for procuring a recommendation from a new doctor were at least as onerous as the burden imposed by using an informant located three hours away who already possessed a recommendation.[12]    The procedures involved for obtaining a recommendation from a new doctor included, for example, surveillance of the informant from outside the doctor's office.

In light of the foregoing, the issue is whether there is any genuine dispute that the defendants harbored a retaliatory motive at the time that they chose not to use the Sacramento CI.[13]

Either direct or circumstantial evidence may demonstrate an impermissible motive in the context of a First Amendment retaliation claim. Mendocino, 192 F.3d at 1301. The question of motive "normally should be left for trial." Ulrich v. City and County of San Francisco, 308 F.3d 968, 979 (9th Cir. 2002). The Ninth Circuit has held, however, that "the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive." Coszalter v. City of Salem, 320 F.3d 968, 978 (9th Cir. 2003); see also Erickson v.

---

[12] Although Benito stated that he wanted recommendations from doctors with whom Dixon Herbs was familiar, Benito Dep. 57:5-9, and a recommendation from a doctor who (presumably) practiced in Sacramento might arguably raise suspicion, neither Miller nor Hale checked Cooksey's recommendation.  Miller Dep. 52:23-53:13; Hale Dep. 59:5-18.  Accordingly, it does not appear that local recommendations were crucial to the investigation.

[13] Because it appears that it was defendants Hale and Miller who made the decision not to use the Sacramento CI, it is only their states of mind that are relevant.   Hale Dep. 68:1-4; Miller Dep. 77:22-24.

1  Pierce County, 960 F.2d 801, 805 (9th Cir. 1992) (reversing jury
2  verdict where evidence failed to support plaintiff's allegation
3  that employer terminated her because of political affiliation);
4  Konig v. Dal Cerro, No. C-04-2210, 2005 WL 2649198 (N.D. Cal. Oct.
5  11, 2005) (granting summary judgment on First Amendment retaliation
6  claim for insufficiency of evidence that plaintiff's protected
7  activity was a substantial or motivating factor in the employer's
8  adverse action).

9        As noted earlier, there are two potential retaliatory motives.
10  The first relates to purported retaliation for plaintiff's advocacy
11  of medical marijuana outside the confines of his office and any
12  particular doctor-patient relationship.  Denney Dep. 39:7-45:18.
13  A retaliatory motive directed toward this outside-of-office speech
14  is not at issue here, because at the time when Hale and Miller
15  declined to use the Sacramento CI, they could not have predicted
16  that Dixon Herbs would subsequently refer McQueen to plaintiff's
17  office.  Instead, it is the second retaliatory motive, aimed at
18  speech occurring within the confines of plaintiff's office, that
19  is at issue.  More precisely, the question is whether it is
20  reasonable to infer that Hale and Miller declined to use the
21  Sacramento CI because they wanted one extra opportunity to
22  retaliate against a marijuana-recommending doctor by sending in an
23  informant or undercover agent to obtain a recommendation.

24        Given the other undisputed facts, however, this motive is
25  implausible.  See United States ex rel. Anderson v. N. Telecom,
26  Inc., 52 F.3d 810, 815 (9th Cir. 1995) (where the other facts of

1   a case make a claim implausible, the non-movant must present more

2   persuasive evidence than would otherwise be required to defeat

3   summary judgment).  If the motive behind foregoing the Sacramento

4   CI was an attempt to squeeze an extra doctor's visit out of the

5   investigation, defendants would not have directed the informants

6   to first attempt to purchase marijuana from Dixon Herbs without a

7   recommendation.  If they were successful, it would have obviated

8   the need to procure the doctors' recommendations.  Instead,

9   defendants would have simply directed the informants to obtain a

10  doctor's recommendation in the first instance.  In fact, however,

11  it was Dixon Herbs who directed McQueen to plaintiff's office.

12      In light of the foregoing, the court finds that one could not

13  reasonably infer that the defendants acted out of a retaliatory

14  motive in deciding not to use the Sacramento CI.  Accordingly, the

15  court grants summary judgment on the First Amendment claim.

16  **B. Equal Protection Claim**

17      Plaintiff also asserts an equal protection claim.  In the

18  prior order, the court held that for purposes of equal protection,

19  an infringement upon the fundamental right to free speech requires

20  that the government's actions be narrowly tailored to achieve

21  legitimate objectives.  Denney, 508 F. Supp. 2d at 835; see also

22  Police Dep't of Chicago v. Mosley, 408 U.S. 92, 101 (1972).

23      The court previously denied defendants' motion to dismiss the

24  equal protection claim in order to allow plaintiff the chance to

25  develop "an evidentiary basis to support his claim that alternate

26  methods could have been employed that would have had the same

1  efficacy in achieving the investigation's stated purpose." <u>Denney</u>,

2  508 F. Supp. 2d at 836.  As noted above, there is a genuine dispute

3  as to whether use of the Sacramento CI might have mooted the

4  necessity of Decker's visit.  Nevertheless, as also noted above,

5  it would be unreasonable to infer that this was motivated by a

6  desire to retaliate against doctors who recommended medical

7  marijuana, given the other facts of this case.  That absence of

8  intent with respect to the First Amendment claim is equally

9  controlling with respect to plaintiff's equal protection claim.

10  <u>See</u> <u>Rosenbaum v. City and County of San Francisco</u>, 484 F.3d 1142,

11  1152 (9th Cir. 2007 (equal protection claim requires proof of

12  discriminatory purpose).  Accordingly, the court grants summary

13  judgment on the equal protection claim.

**IV. Conclusion**

15      For reasons explained above, the court GRANTS defendants'

16  motions for summary judgment.  The clerk is directed to enter

17  judgment and close the case.

18      IT IS SO ORDERED.

19      DATED:  April 22, 2008.


LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

23